**No. Civ-23-15912**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

Sabrina Beram,

Plaintiff-Appellee,

**v.**

City of Sedona,

Defendant-Appellant.

---

On Appeal from the United States District Court
District of Arizona
DC Case No. CV-21-08063
Hon. Diane J. Humetewa

---

# PROPOSED BRIEF OF AMICI CURIAE ARIZONA CENTER FOR DISABILITY LAW, NATIONAL HOMELESSNESS LAW CENTER, DISABILITY RIGHTS EDUCATION & DEFENSE FUND, AND WILLIAM E. MORRIS INSTITUTE FOR JUSTICE

---

Rose Daly-Rooney, AZ Bar No. 015690
Arizona Center for Disability Law
177 N. Church Avenue, Suite 800
Tucson, AZ 85701
Phone (520) 327-9547
rdalyrooney@azdisabilitylaw.org

(Additional Counsel Listed on Signature Page)

TABLE OF CONTENTS

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

INTEREST OF AMICI CURIAE AND AUTHORITY TO FILE .......... 8

CORPORATE DISCLOSURE STATEMENT .......... 8

RULE 29 STATEMENTS .......... 8

SUMMARY OF THE ARGUMENT .......... 9

ARGUMENT .......... 10

I. OBSESSIVE COMPULSIVE DISORDER IS FREQUENTLY MISUNDERSTOOD. .......... 10

II. BECAUSE MS. BERAM ALLEGES PAST INJURY THAT IS IMMINENTLY LIKELY TO RECUR, SHE DEMONSTRATED STANDING ON HER ADA CLAIM FOR DAMAGES, INJUNCTIVE, AND DECLARATORY RELIEF. .......... 13

A. The Americans with Disabilities Act is a broad remedial statute that requires public entities to reasonably modify their enforcement of municipal ordinances .......... 12

B. Ms. Beram demonstrated standing to seek damages on her ADA Title II claim .......... 14

C. Ms. Beram demonstrated standing to seek injunctive and declaratory relief on her ADA Title II claim .......... 19

III. MS. BERAM STATED AN ADA TITLE II CLAIM AGAINST SEDONA FOR DENIAL OF A REASONABLE MODIFICATION OF A CODE THAT BURDENS HER BASED ON DISABILITY .......... 21

IV. MS. BERAM HAS EIGHTH AMENDMENT STANDING BECAUSE SHE PERSONALLY EXPERIENCED ENFORCEMENT ACTION, WAS TWICE THREATENED WITH PROSECUTION, AND THE CITY HAS A PATTERN OF PROSECUTING PEOPLE WHO HAVE RECEIVED WARNINGS...........26

V. GIVEN DEVELOPING EIGHTH AMENDMENT JURISPRUDENCE UNDER THE MARTIN V. BOISE DOCTRINE AND THE TRIAL COURT'S FAILURE TO ANALYZE RULE 12(B)(6), THIS COURT SHOULD REMAND FOR FURTHER DEVELOPMENT OF THE RECORD.....................................33

CONCLUSION..........................................................................................35

CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)(B) AND CIRCUIT RULE 32-1.............388

CERTIFICATE OF FILING AND SERVICE ........................................... ……. 39

## TABLE OF AUTHORITIES

### CASES

Alexander v. Choate, 469 U.S. 287 (1985).............................................................6

*Allen v. Wright*, 468 U.S. 373 (1984) ......................................................................10

*Armstrong v. Davis, 275 F3d. 849 (9th Cir. 2001)*.............................. 11, 12, 13, 14

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979)......................................... 20, 21, 22

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999).............................................................................................16

*Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939 (9th Cir. 2011)......................6

*City & County of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015..............16

*City of Boise, Idaho v. Martin*, 140 S. Ct. 674 (2019)............................................28

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................8, 9

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)..............................................21

*Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014)......................................7

*Crowder v. Kitagawa*, 81 F .3d 1480, 1482 (9th Cir. 1996)........................ 7, 17, 19

*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996)..............................................16

*Duffy v. Riveland*, 98 F.3d 447 (9th Cir. 1996) ................................... 10, 11, 12, 16

*Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ............................ 16, 17

*Fortyune v. Am. Multi-Cinema, Inc*, 364 F.3d 1074 (9th Cir. 2004)........ 7, 9, 13, 14

*Greater Los Angeles Council on Deafness*, 827 F.2d 1353 (9th Cir. 1987)...........11

*Hason v. Med. Bd.*, 279 F.3d 1167 (9th Cir. 2002) ....................16

*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128 (9th Cir. 2001 ....................4, 19

*Isaacson v. Mayes*, No. 23-15234 (9th Cir. Oct. 30, 2023) .................... 24, 25

*Johnson v. California*, 543 U.S. 499 (2005) .................... 11, 12

*Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023) .................... 27, 28

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ....................15

*Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837 (9th Cir. 2004)...17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................... 8, 10, 13, 21

*Martin v. Boise* ....................27

*Martin v. Boise*, 920 F.3d 584 (9th Cir. 2019) .................... 27, 28

*McGary v. Portland*, 386 F.3d 1259 (9th Cir. 2004) .................... 7, 9, 16, 17

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007) ....................22

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ....................21

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829 (9th Cir. 2012) .................... 22, 23, 25

*Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ....................15

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001). ....................6

*Sheehan v. City & County of San Francisco,* 743 F.3d 1211 (9th Cir. 2014) ....................15

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ....................9

*Steffel v. Thompson,* 415 U.S. 452 (1974) .................... 21, 22

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)............................... passim

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ............................................. 23, 24, 26

*Thompson v. Davis*, 295 F.3d 890 (9th Cir. 2002)..................................................16

*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003)...............................................17

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) .........................................8, 10

*US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)............................................ 18, 19

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................................20

**STATUTES**

29 U.S.C. § 794 ..........................................................................................................15

42 U.S.C. § 12101 ..................................................................................................6, 10

42 U.S.C. § 12131 ......................................................................................................15

42 U.S.C. § 12132 ..................................................................................................7, 15

42 U.S.C. § 12134 ........................................................................................................9

U.S.C. § 12201 ...........................................................................................................15

**RULES**

Fed. R. Civ. P. 12(b)(6)...............................................................................................2

**REGULATIONS**

28 C.F.R. § 35.108 ........................................................................................................4

28 C.F.R. § 35.130 ........................................................................... 6, 7, 9, 17

**PUBLICATIONS**

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 237-38 (5th ed. 2013) ....................3, 5

G. Chasson & S. Bates, *They Aren't Like Me, They Are Bad, and They Are to Blame*, Int'l OCD Foundation (2018) ....................3

H. Brock & M. Hany, *Obsessive-Compulsive Disorder* (2023), https://pubmed.ncbi.nlm.nih.gov/31985955/ ....................2

I. Freckelton, *Obsessive compulsive disorder and obsessive compulsive personality disorder and the criminal law*, 27 Psychiatry, Psychol. & L. 831, 832, 838-40 (2020) ....................4

Int'l OCD Foundation, *About OCD*, https://iocdf.org/about-ocd/ (last visited Nov. 4, 2023) ....................3

K. Glazier, et al., *Half of obsessive-compulsive disorder cases misdiagnosed*, Journal of Clinical Psychiatry (2012), https://pubmed.ncbi.nlm.nih.gov/26132683/ ....................3

Nat'l Inst. of Mental Health (NIMH), *Obsessive-Compulsive Disorder*, (Sep. 2022), https://www.nimh.nih.gov/health/topics/obsessive-compulsive-disorder-ocd. ....................4, 5

*Obsessive-Compulsive Disorder DSM-5 300.3,* Theravive, https://www.theravive.com/therapedia/obsessive--compulsive-disorder-dsm--5-300.3-(f42), (last visited Nov. 4, 2023) ....................................................................5

## INTEREST OF AMICI CURIAE AND AUTHORITY TO FILE

*Amici Curiae* the Arizona Center for Disability Law, the National Homelessness Law Center, the William E. Morris Institute for Justice, and the Disability Rights Education & Defense Fund, are national and Arizona-based non-profit legal organizations that collectively possess deep expertise in mental health disabilities, the Americans with Disabilities Act, and Eighth Amendment challenges to municipal camping restrictions. As explained in the accompanying Motion for Leave to File, *Amici* seek to file this proposed brief pursuant to Fed. R. App. P. 29(a)(3).

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, *amici curiae* certify that they are non-profit entities. Amici curiae have no parent corporations, and no publicly traded corporations have any ownership interest in any amici curiae.

## RULE 29 STATEMENTS

*Amici curiae* declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (3) no person—other than the amici curiae or their counsel—contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF THE ARGUMENT

The United States District Court for the District of Arizona erred in denying Plaintiff leave to amend and dismissing this case on standing grounds. Plaintiff-Appellant Sabrina Beram regularly cannot access her apartment because of her disability, obsessive-compulsive disorder (OCD), and on such occasions must instead sleep in her vehicle. Sedona City Code 9.10.010 criminalizes sleeping in a vehicle on both public and private property. Ms. Beram filed this lawsuit alleging violations of Title II of the Americans with Disabilities Act (ADA) and the Eighth Amendment after the City of Sedona refused to grant Ms. Beram's reasonable modification requests under the ADA. The district court dismissed both claims on standing grounds, finding that Ms. Beram had not demonstrated a likelihood of future prosecution.

But, as to Ms. Beram's ADA claim, no threat of future prosecution is necessary to demonstrate standing. And, as to her Eighth Amendment claim, Ms. Beram pled more than sufficient facts to demonstrate a credible threat of prosecution.

The alternative basis for dismissal urged by Sedona under Fed. R. Civ. P. 12(b)(6) also fails. Ms. Beram pled a plausible claim that she was unlawfully denied a reasonable modification necessary to accommodate her disability, and this Court should remand the case to allow for development of the record on her Eighth Amendment claim and adjudication of her ADA claim.

## ARGUMENT

### I. OBSESSIVE COMPULSIVE DISORDER IS FREQUENTLY MISUNDERSTOOD.

OCD[1] is not about perfectionism or liking a tidy home. Many people have occasional obsessive thoughts or rituals, but that does not mean the person has a mental health disorder. Individuals who have been diagnosed with OCD experience recurrent, intrusive and unwanted thoughts (obsessions), and engage in behaviors or mental acts to ignore or neutralize those thoughts (compulsions). *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 237-38 (5th ed. 2013) ("DSM-5"). The disorder compels a person to perform time-consuming, repetitive and sometimes torturous acts. *See id.* at 238; Int'l OCD Foundation, *About OCD*, https://iocdf.org/about-ocd/ (last visited Nov. 4, 2023). To be diagnosed with OCD, the obsessions or compulsions must be so extreme as to take up at least one hour per day, cause clinically significant distress or anxiety, or interfere with activities of daily life. *See* DSM-5 at 237. At its worst, OCD can be debilitating.

[1] Ms. Beram's proposed Fourth Amended Complaint alleges she has a "severe, chronic obsessive-compulsive anxiety disability." [ER-15.] Although OCD was formerly considered a type of anxiety disorder, the most recent revision to the Diagnostic and Statistical Manual of Mental Disorders (DSM) categorized OCD under a new section titled, "Obsessive-Compulsive and Related Disorders." *See* DSM-5 at 235-36; *see also* H. Brock & M. Hany, *Obsessive-Compulsive Disorder* (2023), https://pubmed.ncbi.nlm.nih.gov/31985955/. Amici therefore use the term, Obsessive-Compulsive Disorder (OCD) throughout this brief .

People living with OCD are misunderstood and stigmatized. This is true even among medical professionals. Almost half of all OCD cases are initially misdiagnosed. *See* K. Glazier, et al., *Half of obsessive-compulsive disorder cases misdiagnosed*, Journal of Clinical Psychiatry (2012), https://pubmed.ncbi.nlm.nih.gov/26132683/. Studies polling the general public show that people with OCD are considered to be more to blame for their own symptoms, as compared to people with other serious mental illnesses like schizophrenia. *See* G. Chasson & S. Bates, *They Aren't Like Me, They Are Bad, and They Are to Blame*, Int'l OCD Foundation (2018). People with OCD face both social stigma and internalized stigma. *See id.* As a result of the stigma and lack of understanding about OCD and its symptoms, people with OCD may be treated differently at school, face discrimination in the workplace, and have more interactions with the criminal justice system. *See* I. Freckelton, *Obsessive compulsive disorder and obsessive compulsive personality disorder and the criminal law*, 27 Psychiatry, Psychol. & L. 831, 832, 838-40 (2020).

OCD is considered a disability under the ADA. ADA's Title II regulations define disability to include a physical or mental impairment that substantially limits one or more major life activities. 28 C.F.R. § 35.108(a)(1)(i). OCD "will, in virtually all cases, result in a determination of coverage" under the ADA because it "substantially limits brain function." 28 C.F.R. § 35.108(d)(2)(ii),(iii)(K); *see also Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1134 (9th Cir. 2001 (finding OCD

was an impairment that limited the major bodily function of "caring for oneself" as plaintiff spent "significantly more time than the average person to accomplish the basic tasks of washing and dressing").

OCD can vary greatly person-to-person, and there are many different types of obsessions or compulsions that a person is compelled to perform. *See* Nat'l Inst. of Mental Health (NIMH), *Obsessive-Compulsive Disorder*, (Sep. 2022), https://www.nimh.nih.gov/health/topics/obsessive-compulsive-disorder-ocd. Common obsessions include a fear of germs or contamination, a fear of forgetting or misplacing something, a desire to have things in order or symmetrical, aggressive thoughts toward oneself or others, and unwanted or taboo thoughts involving religion, sex or harm. *See id.* Compulsions are rituals, repetitive behaviors, or mental acts like washing and cleaning rituals that can take hours per day. *Id.*; *see also* DSM-5 at 238. Other common compulsions include ordering things in a particular way, repeatedly checking things such as that the oven is off, and repeated counting or reciting words or prayers. *See* NIMH, *supra*. Adults with OCD often know the obsessions are not "real," but the disorder drives them to perform the ritual anyway. *See* NIMH, *supra*.

Some people with OCD will perform a compulsion for as long as it takes until things look and feel "just right." DSM-5 at 239. For example, a person with a cleanliness obsession may repeat the cleaning rituals for several hours at a time, or an entire day, to quell the feelings of anxiety and unease. *See Obsessive-Compulsive*

*Disorder DSM-5 300.3,* Theravive, https://www.theravive.com/therapedia/obsessive--compulsive-disorder-dsm--5-300.3-(f42), (last visited Nov. 4, 2023). If there are not enough hours in the day to achieve this, it is common for the person to avoid the place entirely or remove themselves from the environment. *See* DSM-5 at 239. Otherwise, the person may experience noticeable anxiety, feelings of disgust, or recurrent panic attacks. *Id*.

## II. BECAUSE MS. BERAM ALLEGES PAST INJURY THAT IS IMMINENTLY LIKELY TO RECUR, SHE DEMONSTRATED STANDING ON HER ADA CLAIM FOR DAMAGES, INJUNCTIVE, AND DECLARATORY RELIEF.

### A. The Americans with Disabilities Act is a broad remedial statute that requires public entities to reasonably modify their enforcement of municipal ordinances.

The ADA is a broad remedial statute designed to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and to ensure that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society." 42 U.S.C. § 12101(a)(1), (b)(1); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001).

A public entity's duty not to discriminate includes an affirmative duty to make "reasonable modifications in policies, practices, or procedures" when "necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that the modifications would fundamentally alter the nature of the service, program, or activity" in question. 28 C.F.R. § 35.130(b)(7)(i); s*ee also Martin*, 532 U.S. at 675.

In enacting the reasonable modification requirement, Congress recognized that "discrimination against the disabled is most often the product, not of invidious animus, but rather of thoughtlessness and indifference, of benign neglect, and of apathetic attitudes[.]" *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944-45 (9th Cir. 2011) (quoting *Alexander v. Choate*, 469 U.S. 287, 295–96 (1985) (internal quotation marks omitted)). "Even facially neutral government actions that apply equally to disabled and nondisabled persons may violate Title II if the public entity has failed to make reasonable accommodations to avoid unduly burdening disabled persons." *Cohen v. City of Culver City*, 754 F.3d 690, 700 (9th Cir. 2014).

The Ninth Circuit has thus expressly found that Title II of the ADA applies to a public entity's enforcement of state laws and municipal ordinances. The ADA may require reasonable modification of a facially neutral administrative regulation whose "enforcement burdens" people with disabilities "in a manner different and greater than it burdens others." *Crowder v. Kitagawa*, 81 F .3d 1480, 1482, 1485 (9th Cir. 1996). "[M]unicipal code enforcement can constitute a benefit of the services, programs, or activities of a public entity under Title II." *McGary v. Portland*, 386 F.3d 1259, 1269 (9th Cir. 2004). The ADA thus prohibits Sedona from enforcing its municipal ordinance in a way that discriminates against Ms. Beram or that fails to reasonably accommodate her needs. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7)(i). This reasonable modification requirement "guard[s] against the façade of 'equal treatment'

when particular accommodations are necessary to level the playing field." *McGary*, 386 F.3d at 1267 (quoting *Fortyune v. Am. Multi-Cinema, Inc*, 364 F.3d 1074, 1086 (9th Cir. 2004)).

### B. Ms. Beram demonstrated standing to seek damages on her ADA Title II claim.

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). To establish standing to pursue injunctive relief, a plaintiff must demonstrate a "real and immediate threat that the[y] will be wronged again," but need not make this showing to seek damages. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). "[S]tanding is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC*, 141 S. Ct. at 2208.

A plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Id.* Ms. Beram plausibly alleges that the denial of her requests for reasonable modification have caused concrete and ongoing harm, including

profound emotional distress stemming from her reasonable fear of arrest and eviction, the worsening of her disability and mental health, the resulting loss of productivity and professional opportunities, and the need to expend time (and by implication, money for fuel) seeking alternative places to sleep, in addition to the stigmatic harm of discrimination. [ER-16; ER-19; ER-108.]

The district court concluded in a footnote that Ms. Beram lacked standing on her ADA claim "for the same reasons her Eight[h] Amendment claim fails[.]"[2] But its analysis of the risk of future prosecution, as applied to Ms. Beram's standing to seek damages under the ADA, applied a requirement of future injury that does not exist. *Lyons*, 461 U.S. at 111; *Fortyune*, 364 F.3d at 1081. The district court also neglected to recognize that a public entity's refusal to make a reasonable modification is itself actionable discrimination under Title II of the ADA. *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.130(b)(7); *see also McGary*, 386 F.3d at 1265-66 (explaining that municipality's refusal to provide reasonable modification to enforcement of municipal ordinance under Title II is a distinct form of actionable discrimination).

"Congress is well positioned to identify intangible harms that meet minimum Article III requirements[.]" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

[2] The footnote appears in the district court's Order denying Ms. Beram's Motion for Leave to File a Proposed Second Amended Complaint. [ER-86.] The district court appears to have imported this analysis into its final order denying leave to amend and dismissing this case, as the final order also does not separately analyze standing on Ms. Beram's ADA claim and Constitutional claim. [ER-4-11.]

Therefore, "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *TransUnion LLC*, 141 S. Ct. at 2204-05 (citations omitted). Discrimination is a paradigmatic example of the type of harm that Congress can elevate into a cognizable injury that satisfies Article III. *See TransUnion LLC*, 141 S. Ct. at 2205 (citing *Allen v. Wright*, 468 U.S. 373, 757 n.22 (1984)). In enacting the ADA, Congress did just that by identifying and proscribing concrete forms of discriminatory harm experienced by people with disabilities, including the "failure to make modifications to . . . practices[.]" 42 U.S.C. § 12101(a)(5).

Thus, when individuals with disabilities challenge a public entity's denial of a reasonable modification, the requisite "injury in fact" for standing purposes occurs upon the refusal to provide the reasonable modification. *See Duffy v. Riveland*, 98 F.3d 447, 453 (9th Cir. 1996). Duffy, a deaf individual incarcerated in the State of Washington, sued over the denial of his requests to be provided a certified sign-language interpreter at prison disciplinary and classification hearings. *Id.* at 452. Because Duffy did not attend the hearings for which he had requested interpretation, the district court noted that "the complaint alleged no damage or prejudice from the lack of an interpreter." *Id.* at 453. In finding standing, this Court cited the observation from *Lujan* that when "the plaintiff is himself an object of the action (or foregone

action) at issue . . . there is ordinarily little question that the action or inaction caused him injury[.]" *Id.* (quoting *Lujan*, 504 U.S. at 561-562).

The *Duffy* Court therefore rejected any argument that Duffy needed to actually attend the hearings and thereby suffer additional harm beyond the allegedly discriminatory denial of his sign language interpreter requests. 98 F.3d at 453. Injury in fact had been established because the defendants' "putatively illegal conduct occurred *upon their refusal* to provide Duffy with an interpreter who, he alleges, satisfied the ADA [and other statutes]." *Id*. (emphasis added). In so holding, the Court noted that the allegedly unreasonable refusal to provide interpretation conferred standing precisely because Congress had passed the ADA to prevent discrimination against people with disabilities. *Id*. (quoting *Greater Los Angeles Council on Deafness*, 827 F.2d 1353, 1358 (9th Cir. 1987)).

Similarly, *Armstrong v. Davis* concerned a class of individuals who were incarcerated or on parole and who sued California correctional agencies and state officials for failure to provide reasonable accommodations during parole and parole revocation hearings. 275 F.3d 849, 855 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005)). This Court found that "actual injury exists because plaintiffs' rights to be free from discriminatory treatment, as provided by the ADA . . . have been violated[.]" *Id.* at 865. There was additional actual injury because the plaintiffs were consequently "deprived of services or programs provided

by the Board: fair parole and revocation hearings." *Id.* Either the discrimination of refused modifications or the downstream injury of unfair parole hearings was "standing alone . . . sufficient to constitute actual injury." *Id.*

Here, Ms. Beram alleges in her proposed Fourth Amendment Complaint that she was denied reasonable modifications under the ADA. The "putatively illegal conduct" which she challenges "occurred upon" the refusal of the City of Sedona to provide either of the requested reasonable modifications. *Duffy,* 98 F.3d at 453. Because it is Ms. Beram who exercised her statutory rights to request a modification, she is herself an "object of the action (or foregone action) at issue." *Id.* Even on its own, Ms. Beram's allegation that she was discriminatorily denied a reasonable modification in violation of Title II of the ADA constitutes actual injury under the statute. *Duffy,* 98 F.3d at 453; *Armstrong*, 275 F.3d at 865.

But Ms. Beram alleges additional injury besides the stigmatic harm of experiencing discrimination in violation of her statutory rights. First, the "overwhelming mental anxiety and depression from fear of being arrested and losing her rental," caused Ms. Beram "to be less productive with work, to lose time with clients and miss out on professional opportunities." [ER-108.] Second, Ms. Beram alleges that she spent over one hundred hours searching for alternative sleeping arrangements because she could not sleep in the parking lot of her apartment without facing a real threat of Code enforcement and resulting eviction. [ER-19.] Finally, after

the denial of her modification requests, she experienced being again awoken in her car by a Sedona police officer in the middle of the night and forced to immediately relocate or face prosecution. [ER-16.]

In sum, Ms. Beram has more than demonstrated an injury in fact. And there is no dispute here about causation or redressability: the injuries alleged flow directly from the denial of Ms. Beram's reasonable modification requests, and could be redressed by the compensatory and injunctive relief sought in this litigation. *See Lujan*, 504 U.S. at 561-62.

### C. Ms. Beram demonstrated standing to seek injunctive and declaratory relief on her ADA Title II claim.

To demonstrate standing to seek forward-looking relief, a plaintiff must "additionally demonstrate a sufficient likelihood that he will again be wronged in a similar way." *Fortyune*, 364 F.3d at 1081 (internal quotation marks omitted). And "a plaintiff may demonstrate an injury is likely to recur by showing that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy." *See Fortyune*, 364 F.3d at 1081 (quoting *Armstrong*, 275 F.3d at 861) (internal quotation marks and alterations omitted).

As Ms. Beram argues, *Fortyune* applies to the analysis of her ADA claim for injunctive and declaratory relief. *See* Appellant's Opening Brief at 31. And while *Fortyune* arose under Title III of the ADA (discrimination in public accommodations), *Fortyune* relied on *Armstrong*, which like this case arose under Title II of the ADA.

*See Armstrong*, 275 F.3d. at 855. In finding standing for plaintiffs seeking injunctive relief, the *Armstrong* Court reasoned that "where the harm alleged is directly traceable to a written policy, there is an implicit likelihood of its repetition in the immediate future." *Id.* at 861 (internal citation omitted). The source of the injury to the plaintiffs were written policies governing parole hearings. *Id.* at 863. The Court therefore found that the continuing existence of those written policies "makes likely the recurrence of such injuries in the immediate future." *Id.*

Ms. Beram similarly alleges that the failure to provide a modification to Sedona's Code is the source of her injuries. The existence of the written Code creates an "implicit likelihood of [the injury's] repetition in the immediate future." *Armstrong*, 275 F.3d. at 861. As the source of Ms. Beram's alleged injury is the refusal to provide a reasonable modification to enforcement of Sedona's Code, Ms. Beram has adequately alleged standing to seek prospective relief to restrain reoccurrence of her injuries under the ADA. *See Armstrong*, 275 F.3d. at 861; *Fortyune*, 364 F.3d at 1081.

## III. MS. BERAM STATED AN ADA TITLE II CLAIM AGAINST SEDONA FOR DENIAL OF A REASONABLE MODIFICATION OF A CODE THAT BURDENS HER BASED ON DISABILITY.

Title II covers the City of Sedona and all the services, programs, and activities of its departments. Title II states that no individual with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or *be subjected to discrimination*

*by any such entity*." 42 U.S.C. § 12132 (emphasis added). Title II defines "public entity" to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A), (B). No statutory exception exists to cast doubt that Sedona and its police and prosecutors are fully within Title II's ambit. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998) (concluding that Title II covers prisons under its broad statutory definition with no statutory carve out for prisons).

Sedona must comply with Title II's anti-discrimination provisions, including the affirmative obligation to provide reasonable modifications, in all of its operations. Title II's phrase "services, programs, or activities[,]"[3] 42 U.S.C. § 12132, brings within its scope "anything a public entity does." *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (internal quotation omitted). This Court "agree[d] with the majority of circuits to have addressed the question that Title II applies to arrests" as part of a police department's "services, programs, or activities[.]" *Sheehan v. City & County of San Francisco,* 743 F.3d 1211, 1232 (9th Cir. 2014)*, rev'd in part, cert. dismissed in part sub nom. City & County of San Francisco, Calif. v. Sheehan*, 575

[3] The Rehabilitation Act defines the term "[p]rogram or activity" as "all of the operations of" a covered entity." 29 U.S.C. § 794(b). Title II, which was modeled after the Rehabilitation Act, cannot "be construed to apply a lesser standard" than those under the Rehabilitation Act. 42 U.S.C. § 12201(a). Therefore, the ADA's "programs, activities, and services" carries the same expansive meaning.

U.S. 600 (2015). Moreover, this Court has consistently applied Title II to numerous similar governmental activities such as zoning[4], health and safety codes[5], licensing[6], prison discipline[7], monitoring parolees[8] and court proceedings.[9]

Sedona engaged in "needless hair-splitting," when arguing that Ms. Beram failed to identify the specific service, program, or activity at issue. Def. Mot. Dismiss 5, ECF No. 27. *See Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002), *cert. denied* 539 U.S. 958 (2003) (internal quotation marks omitted). This inquiry "is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Id.* (internal quotation marks omitted). Municipal code enforcement and police activities are quintessential governmental functions. *McGary*, 386 F.3d at 1268; *Sheehan,* 743 F.3d at 1232.

To state a prima facie case for a violation of Title II, "a plaintiff must show: (1) [s]he is a 'qualified individual with a disability'; (2) [s]he was either excluded from participation in or denied the benefits of a public entity's services, programs, or

[4] *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731–32 (9th Cir. 1999).
[5] *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996).
[6] *Hason v. Med. Bd*., 279 F.3d 1167, 1173 (9th Cir. 2002).
[7] *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996).
[8] *Thompson v. Davis*, 295 F.3d 890, 899 (9th Cir. 2002).
[9] *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001).

activities, or *was otherwise discriminated against by the public entity*; and (3) such exclusion, denial of benefits, or *discrimination* was by reason of [her] disability." *Duvall,* 260 F.3d at 1135 (emphasis added). Under Title II's implementing regulations, discrimination includes Sedona's failure to make reasonable modifications to people with disabilities, unless the modification would "fundamentally alter the nature of the service, program, or activity."[10] 28 C.F.R. § 35.130(b)(7)(i). In *McGary*, this Court held that the plaintiff adequately stated a claim under Title II ADA when he alleged that the City failed to reasonably accommodate his disability by refusing an extension to participate in the nuisance abatement program before incurring charges for a code violation. 386 F.3d at 1269. Moreover, "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 28 C.F.R. pt. 35, app. B, subp. B, § 35.130, at 707 (2020). "[T]he determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Crowder*, 81 F.3d at 1486. Plaintiffs need only allege that the proposed modification "seems reasonable on its face, *i.e*, ordinarily or in the run of cases." *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002).

---

[10] "Whether an accommodation fundamentally alters a service or facility is an affirmative defense" and "an intensively fact-based inquiry." *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004) (internal quotation omitted). For this reason, courts typically resolve this question after findings of fact. *See Crowder*, 81 F.3d at 1485-86; *Townsend v. Quasim*, 328 F.3d 511, 520 (9th Cir. 2003).

Here, Ms. Beram's proposed Fourth Amended Complaint addresses each element of an ADA Title II claim. She lives with severe and chronic OCD. [ER-15.] As a symptom of OCD, Ms. Beram experiences compulsions to clean that she must complete to remain in her apartment to sleep. [*Id.*] These cleaning rituals take several hours and when she perceives she cannot complete the obsessive cleaning rituals in time to get a restful sleep, she is unable to enter her apartment and so sleeps in her car as a coping mechanism. [*Id.*] Because of the severity of the OCD, Ms. Beram must employ this coping mechanism about three nights weekly and has slept in the parking lot of the apartment complex where she resides and in public spaces. [*Id.*].

The Code makes it unlawful for her to sleep in her car in private and public spaces and there are no written Code exemptions for her to sleep in her car when necessary due to her OCD. [ER 16-17.] On February 10, 2021, Ms. Beram, through her attorneys, made a reasonable modification request under Title II of the ADA, asking that Sedona grant an exemption under the Code because of disability. [ER-20.] On February 24, 2021, she made a second narrower reasonable modification request for an exemption of the application of the Code when sleeping in the parking lot of her apartment complex. [ER-21.] Sedona denied both reasonable modification requests. [*Id.*] In or around October 2022, a Sedona police officer told her she could not sleep in her car and ordered Ms. Beram to move her or be cited. [ER-16.] Pursuant to the Code, after one warning, Sedona police may arrest and prosecute Ms. Beram for

sleeping in the parking lot of her apartment, on other private property, or in a public place.[11] [*Id.*] Ms. Beram has suffered—and continues to suffer—dignitary harms from experiencing discrimination, emotional distress, including exacerbation of anxiety and deterioration of her OCD, and monetary losses related to finding other areas to park her car to sleep directly related to Sedona's Code and code enforcement. [ER-19-20.]

These facts support a nexus between her disability and the requested reasonable modification. Ms. Beram's compulsive cleaning rituals and the coping strategy of sleeping in her car when she is unable to complete these rituals in her apartment are a result of and a part of her disability. *Cf. Humphrey,* 239 F.3d at 1139–40 (9th Cir. 2001) (observing that where employer fired employee with OCD for attendance issues, "conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination"). And the modification requests are plausible on their face. *Crowder*, 81 F.3d at 1484; *McGary*, 386 F.3d at 1269.

Although the district court did not rule on whether Ms. Beram stated a claim under Title II of the ADA, [ER-11], it is clear that she did state a claim because she pled facts plausibly alleging her disability as well as the discriminatory denial of a reasonable modification necessary to prevent repeated enforcement of Sedona's Code against involuntary conduct stemming from her disability.

## IV. MS. BERAM HAS EIGHTH AMENDMENT STANDING BECAUSE SHE PERSONALLY EXPERIENCED ENFORCEMENT ACTION, WAS TWICE THREATENED WITH PROSECUTION, AND THE CITY HAS

[11] Ms. Beram alleges other prior warnings. [ER-15-16.]

**A PATTERN OF PROSECUTING PEOPLE WHO HAVE RECEIVED WARNINGS.**

Like the seminal *Driehaus* case, "[t]his case concerns the injury-in-fact requirement, which helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). As the Supreme Court explained in *Driehaus*, a plaintiff adequately pleads an injury-in-fact in pre-enforcement cases where, as here, Ms. Beram alleges: (1) an "intention to engage in a course of conduct arguably affected with a constitutional interest," that is; (2) "proscribed by a statute," and; (3) a "'***credible threat of prosecution*** thereunder.'" *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasis added)).

The purpose of the "injury-in-fact" requirement is to ensure a personal stake in the outcome. *Driehaus*, 573 U.S. at 158. There is a substantial body of standing jurisprudence analyzing the "somewhat elastic concept" of "imminence" to determine whether a prospective harm is sufficiently concrete to indicate a personal stake in a law's constitutionality. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 148 (2010)); *see also Lujan*, 504 U.S. at 565, n. 3. Indeed, *Clapper*, *Monsanto*, and *Lujan* were Sedona's primary authorities for arguing Ms. Beram had not alleged an injury-in-fact. [July 16, 2021, Mot. Dismiss by City of Sedona, at 2–3 (ECF No. 27)].

But in 2014, one year after *Clapper*, the Supreme Court clarified that dogmatic adherence to the concept of imminence can lead to erroneous outcomes in cases seeking pre-enforcement review of criminal statutes where the plaintiff alleges a ***credible threat of enforcement***. *See Driehaus*, 573 U.S. at 158–60 (citing *Babbitt*, 442 U.S. at 298; *Steffel v. Thompson,* 415 U.S. 452, 459 (1974)) (emphasis added). The High Court explained:

> In *Steffel*, . . . police officers threatened to arrest petitioner and his companion for distributing handbills. . . . Petitioner left to avoid arrest; his companion remained and was arrested and charged with criminal trespass. . . .
>
> [P]etitioner had alleged a credible threat of enforcement: He had been warned to stop handbilling and threatened with prosecution if he disobeyed; he stated his desire to continue handbilling . . . ; and his companion's prosecution showed that his "concern with arrest" was not "'chimerical.'" 415 U.S., at 459. Under those circumstances, . . . "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Ibid.*

*Id.* at 195; *see also MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.") (emphasis in original).

The Ninth Circuit independently interpreted *Babbit* and other pre-enforcement relief cases further than *Driehaus*. *See Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 836–37 (9th Cir. 2012) ("arrest is not necessarily a

prerequisite for an individual to challenge the applicability of a criminal statute"). In *Oklevueha*, plaintiffs who had never been threatened with, much less charged under, a challenged statute had pre-enforcement standing because the government took some enforcement action against them under the authority of the statute that fell short of actual prosecution—in that case, seizure of property. *Id.* at 836–37. The Ninth Circuit concluded the plaintiffs' personal experience with a measure of enforcement *short of prosecution* "eliminat[ed] any concerns that [their] fear of enforcement [was] purely speculative." *Id.* at 837. Ms. Beram similarly alleges personally experiencing enforcement action that fell short of prosecution. Specifically, she alleged that Sedona police have twice ordered her to vacate under the authority of the Code, one of which occurred *during the pendency of this action*. [ER-12–13, ER-15–16, & ER-102.]

The Ninth Circuit routinely holds that plaintiffs with far more attenuated allegations than Ms. Beram's have Article III standing to seek pre-enforcement redress. Only three months ago the Ninth Circuit separately applied the *Oklevueha* and *Driehaus* analyses to hold that plaintiffs who, unlike Ms. Beram, experienced neither personal threats of prosecution nor enforcement action short of prosecution, nonetheless had standing because their compliance with a law they alleged to interfere with the exercise of a constitutionally protected right constituted a cognizable injury-in-fact on its own. *Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023) (rejecting government "suggestion that a plaintiff must *always* prove 'a specific warning or

threat'" because credible threat factors are a totality analysis, not a checklist). Applying *Oklevueha* first, the Ninth Circuit held that "a threat of prosecution is unnecessary to prove standing where the plaintiffs' injury is 'not a hypothetical risk of prosecution but rather actual, ongoing . . . harm resulting from their' adherence to the challenged statute." *Id.* at 944, n.2 (citation omitted). Applying the *Driehaus* factors, the *Teter* court then reasoned that the plaintiffs had standing because they wanted to exercise their protected right to possess butterfly knives, they voluntarily discarded their knives to comply with the challenged statute, they would buy new knives but for the statute criminalizing doing so, and the Hawaiian government had prosecuted about thirty (30) people over ten (10) years for that offense. *Id.* at 946. This Court concluded that the foregoing allegations, "[o]n balance, . . . established a credible threat of enforcement." *Id.*

Significantly, one day before Ms. Beram filed her Opening Brief, the Ninth Circuit again conferred Article III standing on plaintiffs who, unlike Ms. Beram, experienced neither threats of prosecution nor government enforcement action short of prosecution. *See Isaacson v. Mayes*, --- F.4th ----, No. 23-15234, 2023 WL 7121091, at *6 (9th Cir. Oct. 30, 2023). *Isaacson* rejected the contention that constitutional challenges "cannot be reviewed before enforcement" if the court "do[es] not know if the litigant will ever be deprived of his liberty." *Id.* This Court explained:

> [S]uch a rule would bar all claims based on the prospect of imminent future injury. We cannot discern the future and

> cannot know whether future harm will actually occur. But we can, and do, try to decide whether the harm is sufficiently likely ***so that the litigant need not wait until the harm occurs***.

*Id.* The *Isaacson* plaintiffs were physicians challenging newly-passed criminal abortion laws that were enjoined before taking effect in 2021. *Id.*, at *2–3. The district court lifted the preliminary injunction following the landmark *Dobbs* opinion, in which the Supreme Court overturned *Roe v. Wade*, and held that the plaintiffs no longer had standing for pre-enforcement review. *Id.*, at *3. This Court reversed, holding that the physicians demonstrated standing merely by alleging "two imminent future injuries affecting [their constitutionally protected] interests": (1) their liberty interests, because the offenses were punishable by incarceration, and; (2) their property, "because a statutory violation may result in . . . loss of revenue, and monetary damages." *Id.*, at *6.

Here, there is no dispute that Ms. Beram "sufficiently alleged a concrete plan to violate the Code." [ER-7.] There is also no dispute that the Code is punishable by incarceration. The only question is whether Ms. Beram alleged an injury-in-fact, which she has under both the *Oklevueha* and *Driehaus* standards. First, as Ms. Beram argues in her Opening Brief—and recent Ninth Circuit precedent reaffirms—she has alleged a personal stake sufficient to confer standing for pre-enforcement relief. Ms. Beram established a person stake in this controversy based solely on her multiple personal experiences with government enforcement actions that fell short of

prosecution. In fact, her landlord refused to renew her lease unless Ms. Beram signed the Addendum, agreeing "not to sleep in any vehicle that is parked" in the apartment complex. [ER-18–19, -110 (the Addendum).] Accordingly, Ms. Beram's previous injuries under the City's failure to grant an ADA modification and for being forced to vacate, twice, under the authority of the Code constitute "harm resulting from adherence to the challenged statute," and this Court need not determine whether she has demonstrated a threat of future prosecution *or* evaluate the City's pattern of enforcing the Code against others.

But Ms. Beram has also satisfied the *Driehaus* factors by demonstrating a credible threat of prosecution. Ms. Beram never says that the Addendum to the rental contract has been lifted, even under the Agreement she executed to settle her claims against her landlord. [See ER-21 (the Agreement).] In fact, Ms. Beram's practice of sleeping in her car on *public* property, rather than in her apartment parking lot, did not begin until after the Addendum was imposed, [ER-21], and Ms. Beram makes clear that she will continue to sleep in public spaces when her OCD involuntarily requires her to. [ER-22.] Viewed in the light most favorable to her as non-moving party, Ms. Beram will be evicted if either she or her landlord are charged under the Code, whether that charge stems from her involuntarily sleeping in her car in her private apartment parking lot or in a public park. Moreover, Ms. Beram can no longer sleep in her car while parked in her apartment parking lot because the Addendum prohibits her from

doing so, regardless of whether she is charged. Significantly, the City has *twice* ordered her to vacate under the authority of the Code. Finally, the City's demonstrated pattern of warning and prosecuting individuals for sleeping in cars *even in private parking lots* are just as "good evidence" that future enforcement is likely as Hawaii's nearly identical pattern of prosecuting possession of butterfly knives under the *Driehaus* analysis in *Teter*. Accordingly, Ms. Beram faces a credible threat of prosecution for sleeping in her car, either in public parks or in her private apartment complex.

## V. GIVEN DEVELOPING EIGHTH AMENDMENT JURISPRUDENCE UNDER THE MARTIN V. BOISE DOCTRINE AND THE TRIAL COURT'S FAILURE TO ANALYZE RULE 12(B)(6), THIS COURT SHOULD REMAND FOR FURTHER DEVELOPMENT OF THE RECORD.

Ms. Beram's Eighth Amendment claim is sound under the Ninth Circuit's *Martin v. Boise* doctrine. Specifically, the "Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside" when they "have no adequate, alternative shelter," *Martin v. Boise*, 920 F.3d 584, 616 (9th Cir. 2019), that is "practically" or "realistically available to them," *Johnson v. City of Grants Pass*, 72 F.4th 868, 896 (9th Cir. 2023), *cert. pet. pending*, *City of Grants Pass v. Gloria Johnson, et al.*, No. 23-175 (Aug. 22, 2023. This is because sitting, lying, and sleeping "are universal and unavoidable consequences of being human." *Martin*, 920 F.3d at 617 (citation omitted); *see also Grants Pass*, 72 F.4th at 896 (recognizing that sleeping requires those "rudimentary forms of protection" necessary to secure an

unhoused individual "from the elements"). The Eighth Amendment standard requires an individualized consideration of a person's circumstances. *See Johnson*, 72 F.4th at 877. For example, even if the plaintiff technically might have access to an open shelter bed, it may not be "adequate" or "practically" available to them because of their individual circumstances, including their familial status, disability status, or religion. *See Johnson*, 72 F.4th at 877, 879.

Although the *Martin* doctrine is only five years old, it was affirmed by denial of rehearing *en banc* in 2019 and then *reaffirmed* earlier this year by denial of rehearing *en banc* in *Johnson v. Grants Pass*, its successor. In 2019, the Supreme Court denied Boise's petition for *certiorari*. *City of Boise, Idaho v. Martin*, 140 S. Ct. 674 (2019). Nonetheless, after receiving twenty-four amicus briefs in support of *certiorari*, the Supreme Court recently ordered Gloria Johnson to respond to the Grants Pass petition by December 6, 2023. Although *amici* firmly believe that the Supreme Court should deny *certiorari* as it did in *Martin* in 2019, the case is nonetheless on track to receive an opinion by October of next year if the High Court does accept it.

In this case, the trial court *thrice* failed to analyze whether Ms. Beram stated a claim under Rule 12(b)(6). [ER-11; ER-27–33; ER-77–87.] The trial court also appears to have improperly considered extrinsic evidence offered by the defendant at the pleading stage, including multiple declarations by City employees challenging Ms.

Beram's facts as alleged, [*See, e.g.*, ER-89 (Amended Declaration of Charles Husted)], and then *weighed* that evidence against Ms. Beram's allegations without construing the facts in her favor as required, [*see, e.g.*, ER-10 (concluding that Ms. Beram is permitted to sleep in her vehicle at her apartment complex despite her allegations to the contrary from the Addendum).] To the contrary, the district court appears to have construed myriad hypothetical circumstances *against* Ms. Beram. For example, the district court discounted Ms. Beram's allegation that a Sedona officer warned her in November 2020 and noted the warning to create a record merely because Ms. Beram did not state whether that the officer who warned her in 2022 found said record. [ER-7–8.]

Accordingly, while *amici* agree with Ms. Beram that she has stated a claim under both the ADA and the Eighth Amendment, it would be wholly inequitable to evaluate the merits of Ms. Beram's Eighth Amendment claim under Rule 12(b)(6) based on such an undeveloped record. This Court should instead reverse the district court's erroneous dismissal for lack of standing and remand with instruction to permit Ms. Beram to file an amended complaint.

## CONCLUSION

*Amici Curiae* respectfully urge the Court to reverse and remand.

Respectfully submitted,

*s/Rose Daly-Rooney*
Arizona Center for Disability Law
Rose Daly-Rooney

*s/William Knight*
National Homelessness Law Center
William Knight

*s/Brenda Munoz Furnish*
William E. Morris Institute for Justice
Brenda Munoz Furnish

*s/Michelle Uzeta*
Disability Rights Education & Defense Fund
Michelle Uzeta

Dated: November 7, 2023

William Knight
National Homelessness Law Center
2000 M Street NW, Suite 750-E
Washington, DC 20036
Tel: (202) 638-2535
wknight@homelesslaw.org

Brenda Furnish
Michelle J. Simpson
William E. Morris Institute for Justice
3707 North 7th Street, Suite 300
Phoenix, Arizona 85014
Tel: (602) 252-3432
bmfurnish@mijaz.org
mjsimpson@mijaz.org

Michelle Uzeta, Deputy Legal Director
Disability Rights Education & Defense Fund
3075 Adeline Street, Suite 210
Berkeley, CA 94703
Tel: (510) 644-2555
muzeta@dredf.org

Attorneys for Amici Curiae
Arizona Center for Disability Law,
National Homelessness Law Center,
Disability Rights Educations & Defense Fund,
and the William E. Morris Institute for Justice

## CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)(B) AND CIRCUIT RULE 32-1

I certify that the forgoing brief of Arizona Center for Disability Law, National Homelessness Law Center, William E. Morris Institute for Justice, and Disability Rights Education & Defense Fund complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 6961 words as determined by the word count function in Microsoft Office Word 2016, is proportionately spaced, and has a typeface of 14 points.

Signed: *s/Rose Daly-Rooney*
Rose Daly-Rooney
ARIZONA CENTER FOR
DISABILITY LAW
177 North Church Avenue, Suite 800
Tucson, Arizona 85701 Email:
rdalyrooney@azdisabilitylaw.org
Tel: (520) 327-9547
Fax: (520) 884-0992

*Attorney for Amicus Arizona Center for Disability Law*

Dated: November 7, 2023

## CERTIFICATE OF FILING AND SERVICE

U.S. Court of Appeals Docket Number: CV-21-08063

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 7, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: *s/Rose Daly-Rooney*
Rose Daly-Rooney